**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID SCOTT DETRICH,
            *Petitioner-Appellant,*

v.

CHARLES L. RYAN,* OF ARIZONA
DEPARTMENT OF CORRECTIONS,
            *Respondent-Appellee.*

No. 08-99001

D.C. No.
4:03-cv-00229-DCB

OPINION

On Remand From The United States Supreme Court

Filed May 2, 2012

Before: Harry Pregerson, M. Margaret McKeown, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge McKeown

*Charles L. Ryan is substituted for his predecessor Dora B. Schriro as Director of the Arizona Department of Corrections. Fed. R. App. P. 43(c)(2).

## COUNSEL

Jennifer S. Bedier (argued), Arizona Capital Representation Project, and Gregory J. Kuykendall, Kuykendall & Associates, Tucson, Arizona, for petitioner-appellant David Scott Detrich.

Terry Goddard, Attorney General; Kent E. Cattani (argued), Chief Counsel; and Donna J. Lam, Assistant Attorney General, Tucson, Arizona, for respondent-appellee Charles Ryan.

## OPINION

PAEZ, Circuit Judge:

An Arizona judge sentenced David Scott Detrich to death after a jury convicted him of murder, kidnapping, and sexual abuse. After exhausting his state remedies, Detrich filed a petition for a writ of habeas corpus in federal district court alleging, among other things, that his trial counsel was unconstitutionally ineffective at the penalty phase for failing to investigate and present substantial mitigating evidence and for failing to rebut the state's arguments that aggravating circumstances warranted a death sentence.[1] Applying the standards

---

[1] Detrich also raised claims relating to the guilt phase of his trial. We addressed those claims in a memorandum disposition that we filed simultaneously with our prior opinion. When the Supreme Court granted certiorari in this case, it did not disturb our separate memorandum.

of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, the district court denied relief.

In our opinion reported at 619 F.3d 1038 (9th Cir. 2010), we reversed the district court's denial of Detrich's habeas petition. We concluded that the state court's decision that Detrich's counsel, Harold Higgins, performed competently involved an unreasonable application of federal law, as determined by the Supreme Court. We next held that the state court's decision that Detrich was not prejudiced by Higgins's errors resulted from an unreasonable determination of the facts. Finally, considering the prejudice inquiry de novo, we concluded that there was a reasonable probability that Detrich would have received a sentence less than death but for Higgins's deficient representation.

The United States Supreme Court granted certiorari, vacated our judgment, and remanded this case for further consideration in light of *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011). *See Ryan v. Detrich*, 131 S. Ct. 2449 (2011) (Mem.). Having reconsidered the facts and issues of this case in light of *Pinholster*, *see* discussion *infra* at p. 4584, we again conclude that Detrich is entitled to habeas relief.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Crime

As recounted in the Arizona Supreme Court's opinion on direct appeal, Detrich and a co-worker, Alan Charlton, left work on November 4, 1989, and went to a local bar in Benson, Arizona, where the two consumed between 12 and 24 beers each, according to Charlton's estimate. *State v. Detrich* (*Detrich II*), 932 P.2d 1328, 1331 (Ariz. 1997). The men then drove to Tucson, where they drank more beer at more bars. *Id.* Later that night, they picked up Elizabeth Souter, the eventual victim, who was walking along the road. *Id.* At Detrich's

request, Souter directed him to a "roadhouse" where he could buy cocaine. *Id.* The two men and Souter then drove to Souter's home, where Detrich attempted to cook the cocaine in a spoon so that it could be injected. *Id.* When the syringe would not pick up the cocaine, Detrich began screaming that "the needle wasn't any good, or the cocaine wasn't any good" and told Souter that she would have to pay for the bad drugs by having sex with him. *Id.* Three witnesses—Charlton and two others—reported that Detrich was holding a knife against Souter's throat. *Id.*

Detrich then told Souter they were going for a ride, and Detrich, Charlton, and Souter left in Charlton's car. *Id.* Charlton drove, Detrich sat in the middle, and Souter sat on the passenger side, against the door. *Id.* Charlton testified that, while stopped at a red light, he saw Detrich "humping" Souter and asking her how she liked it. *Id.* Soon thereafter, Charlton looked again and saw that Souter's throat was slit. *Id.* Charlton further testified that Detrich then hit Souter and asked her who gave her the drugs, and that Souter only gurgled in response. *Id.* at 1331-32. Detrich asked twice more, and Souter again responded with only a gurgle. *Id.* at 1332. Charlton claims that he never saw Detrich actually stab Souter, but that he himself was poked in the arm with a knife several times. *Id.* A pathologist established that Souter was stabbed forty times. *Id.*

Charlton testified that, at this point, Detrich said to him, "It's dead but it's warm. Do you want a shot at it?" *Id.* Charlton declined. *Id.* The two pulled over in a remote area approximately fifteen minutes from Souter's home, and Detrich dragged Souter's body into the desert. *Id.* The two men then drove to a friend's house in Tucson. *Id.* The friend testified that the men showed up at his house at 4 a.m., that Detrich was covered in blood, and that Charlton had blood only on his right side. *Id.* About an hour later, Detrich told the friend that he had killed a girl by slitting her throat because she had given them bad drugs. *Id.*

Several days later, the friend called in an anonymous tip to the police. *Id.* Based on the tip, the police arrested Charlton, who confessed to his involvement in the crime. *Id.* Several days later, Detrich was arrested in New Mexico with a folding knife in his possession. *Id.* Although Charlton admitted the knife was his, he explained that it often fell out of his pants, and that Detrich had the knife on the night of the murder and the next morning, when it was covered in blood. *Id.*

Charlton entered into a plea bargain under which he pleaded guilty to kidnapping and agreed to testify against Detrich in exchange for the prosecution dropping the capital murder charge against him. Charlton was sentenced to ten and a half years' imprisonment.

## B.   1990-1991 Trial, Sentencing, and Appeal

Detrich was charged with first-degree murder, kidnapping, and sexual assault. *State v. Detrich* (*Detrich I*), 873 P.2d 1302, 1304 (Ariz. 1994). Detrich's first trial ended in a mistrial when a prosecution witness mentioned that Detrich had invoked his right to remain silent at one point during the investigation. *Id.* After a retrial, the jury convicted Detrich of first-degree murder and kidnapping, acquitted him of sexual assault, and convicted him of the lesser-included offense of sexual abuse. *Id.* The state sought the death penalty. *See id.* at 1303.

Pursuant to Arizona law, the sentencing judge held a hearing to determine whether aggravating and mitigating circumstances were present. *See* Ariz. Rev. Stat. § 13-703(B) (1995), *invalidated by Ring v. Arizona*, 536 U.S. 584 (2002).[2] Under Arizona law at the time, if the sentencing judge found one or more of ten enumerated aggravating circumstances, he had to impose the death penalty unless mitigating circumstances out-

---

[2] Unless otherwise indicated, all citations to Arizona Revised Statutes § 13-703 are to the 1995 version of the law.

weighed the aggravating factors. *Id.* § 13-703(E). At the sentencing hearing, the prosecution urged the court to find as an aggravating circumstance that the crime was "especially cruel, heinous, or depraved."

In response, defense counsel noted that a doctor had testified that he could not tell whether the victim had actually experienced conscious, physical pain and suffering and urged the court to find several mitigating circumstances. First, counsel argued that Detrich did not have the capacity to appreciate the wrongfulness of his acts or to conform his conduct to the law due to his extreme intoxication, and possible black-out, at the time of the murder. In support of this argument, counsel noted that Detrich had no known pattern of aggressive behavior and that Detrich's problems with alcohol had existed since he was nine years old. Further, defense counsel urged the court to find as mitigating circumstances Detrich's co-defendant's mere ten-and-a-half-year sentence and Detrich's remorse.

Three days after this hearing, the trial judge sentenced Detrich to death, concluding that the murder had been committed in an "especially cruel, heinous, and depraved" manner, and that no mitigating circumstances were proven.

Detrich appealed his conviction and sentence to the Arizona Supreme Court. *See Detrich I*, 873 P.2d at 1303. That court reversed his kidnapping and murder convictions because of a defective jury instruction and remanded for a new trial on those charges. *Id.* at 1306 07.

## C.   1994-1995 Trial, Sentencing, and Appeal

New counsel, Harold Higgins, was appointed for Detrich's retrial. The jury convicted Detrich of kidnapping and first-degree murder, but did not unanimously agree on a single theory of first-degree murder: nine jurors found premeditation; eleven found felony murder; and eight found both.

The prosecution sought the death penalty and filed a sentencing memorandum alleging as an aggravating circumstance that the crime was especially cruel, heinous, and depraved, and arguing that this aggravating factor outweighed the mitigating factors. In response, Detrich's counsel filed a three-page sentencing memorandum that did not challenge the state's aggravation case, and instead argued that the court should not impose the death penalty because the jury's lack of unanimity about whether Detrich had committed premeditated murder or just felony murder indicated that the jury was not convinced that Detrich actually committed the murder. In addition, the memorandum pointed to new evidence presented at the second trial that suggested that Charlton, not Detrich, may actually have killed Souter.

The sentencing memorandum also listed five mitigating factors, with little elaboration or argument: Detrich's diminished capacity due to voluntary intoxication, his "abusive background," his lack of previous convictions involving serious injury or threat thereof, his remorse, and the minimal sentence received by his co-defendant. The only elaboration on any of these factors was a note that Detrich's "abusive background" was "[f]ully detailed in" an October 18, 1994, letter from Detrich's sister, and an explanation that "[t]he evidence was clear that Defendant Detrich was highly intoxicated due to alcohol at the time of the incident, and perhaps had also ingested cocaine. In addition, [the sister's letter] makes it clear Defendant has a lengthy history of alcohol abuse and was encouraged into same by his parent-figures."

Higgins did little to bolster these arguments. He did not employ a mitigation investigator, nor did he ask his investigator, James Williams, to investigate mitigating evidence. In any event, Williams was not qualified to do a life history investigation. At most, Williams made phone calls to family members, but no one responded. According to Detrich's sister, Diana Jo Stevens, someone from the defense team contacted her shortly before the sentencing hearing and asked her

to write a letter "about David." She wrote the letters not knowing what to include or for what purpose they would be used. In all, Higgins spent only ten and a half hours on the penalty phase of Detrich's trial, including the time spent at the penalty-phase hearings themselves.

In February 1995, the court held an aggravation/mitigation hearing. At the beginning of the hearing, Higgins gave the sentencing judge two more letters, totaling ten hand-written pages, from Detrich's sister, Diana Jo Stevens. One letter provided information about Detrich's abusive childhood, and the other letter simply made a plea for mercy. To give himself time to consider these newly submitted letters, the trial judge scheduled the sentencing for two days later.

At the aggravation/mitigation hearing, the prosecution argued that the crime was "especially cruel, heinous, [and] depraved," an aggravating circumstance that could authorize a death sentence under Arizona Revised Statutes § 13-703(F)(6). The prosecution argued that the crime was "especially cruel" because Souter suffered a slit throat and forty-five knife injuries, some of which were defensive; because she was conscious during some of the attack, as indicated by her gurgling attempts to respond to Detrich's questions; and because she suffered mentally when she was held at knifepoint and threatened with sexual assault. In addition, the prosecution argued that the crime was "especially heinous or depraved" because it involved gratuitous violence, "well beyond that required to accomplish the killing"; because Detrich apparently relished the murder, as evidenced by his asking Charlton if he "want[ed] a shot" at the dead body and his telling a friend the next morning that he slit her throat because she had gotten him bad drugs; because the killing was senseless; and because the victim was helpless.

Higgins responded with three arguments: (1) Detrich was not death-eligible under *Tison v. Arizona*, 481 U.S. 137 (1987), because he did not actually commit the murder, (2)

the crime was not especially cruel, heinous, or depraved, and (3) mitigating circumstances called for leniency. First, Higgins argued that Detrich was not death-eligible under *Tison v. Arizona*, given the "many uncertainties that now exist as to what specifically happened, and as to who did what." In support of this argument, Higgins pointed to new evidence presented in Detrich's second trial suggesting that Detrich may not actually have committed the murder. Higgins argued that the jurors' failure to reach unanimous agreement that Detrich had committed premeditated murder reflected their doubt about Charlton's testimony that Detrich had murdered the victim. According to Higgins, if Detrich was not the perpetrator, he was not death-eligible under *Tison*.

Second, to rebut the prosecution's aggravation case, Higgins argued that the uncertainty about who actually committed the murder prevented finding that Detrich had acted in a cruel, heinous, or depraved manner. In addition, Higgins argued that many of the knife wounds were "minor"; that it was unclear whether Souter lived, and suffered, after the first of the most serious wounds was inflicted; and that Charlton's statement that Detrich had asked him if he "want[ed] a shot at" the dead body was of questionable credibility.

Third, Higgins argued that mitigating circumstances warranted leniency. In support of his mitigation case, Higgins called no witnesses, introduced as evidence only the three letters from Detrich's sister, Diana Jo Stevens, and made a short argument spanning only five transcript pages.

In his mitigation argument, Higgins first contended that Detrich's intoxication at the time of the crime diminished his capacity to appreciate the wrongfulness of his conduct. Higgins explained that Detrich had a longstanding problem with alcohol, as he had been "encouraged by a parent at a very, very early age to engage in this type of alcohol abuse," and that, given this history, Detrich's intoxication should not be considered fully "voluntary." As the pre-sentence report

("PSR") and letters from Detrich's sister reported, Detrich had begun using alcohol at age eight or nine at the encouragement of his step-father, Skip. When Skip and Detrich's mother would fight, Skip would take Detrich and leave, and the two would stay out drinking all night long. When Detrich was about fifteen years old, he could guzzle a half-pint of whiskey in one drink for Skip's friends. Once, Skip and Detrich went on a week-long drinking spree and ended up three hundred miles away.

Higgins next briefly pointed to abuse Detrich suffered as a child as a mitigating factor. According to the letters from Detrich's sister, Detrich had suffered physical and mental abuse and had been introduced to drinking by his parents. Although Higgins did not present any live witnesses or other evidence that would compellingly portray Detrich's abusive childhood, the sentencing judge was aware of the basic facts of Detrich's upbringing from the PSR, psychological reports (none of which Higgins had provided the court), and the letters from Detrich's sister.

In particular, the sentencing judge knew that Detrich was born with a cleft palate that was surgically corrected, that his parents divorced when he was young, and that he and his siblings began living with their father after their father and step-mother refused to let them return to their mother's home after a two-week visit. The sentencing judge also knew that Detrich was "severely mistreated and frequently physically abused" by his step-mother, Jean, who frequently told the children how much she hated them and did not want them around, once held Detrich underwater in the bathtub, and once tied him to a post outside, telling him he was no better than a dog. Detrich sometimes wet the bed at night, and Jean would spank him with a belt, make him wash the sheets before school, and publicly humiliate him about it. Once, Jean pushed Detrich's brother, Danny, down the basement steps and then put a pistol to Danny's head, screaming that she would kill the kids if they told their father what happened. After five years with

their father, Detrich and his siblings moved back with their mother and Skip. Skip was verbally and physically abusive to Detrich's mother, who abused drugs and was "just there." As a child, Detrich would sometimes leave for two or three weeks, and his mother would never ask him where he had been.

At the aggravation/mitigation hearing, Higgins next pointed out that Detrich had no prior criminal record involving violence and that he had exhibited remorse about having been involved in the crime. Additionally, Higgins suggested that the short sentence given to Charlton should constitute a mitigating circumstance. Finally, Higgins urged the court to consider as mitigation the fact that Detrich had a ten-year-old son, "who ought to have some contact with some fatherly influence."

The prosecutor then rebutted defense counsel's arguments that there was residual doubt about who actually committed the murder and that mitigating circumstances warranted a sentence less than death. The prosecutor dismissed the evidence of Detrich's abusive childhood because "there has to be some kind of causal connection between the abuse or the dysfunctional family background and the conduct." Higgins did not respond to this, or any other, argument.

Two days later, the court sentenced Detrich to death. The court found that Detrich was death-eligible under *Tison* and that the prosecution had proved the statutory aggravating circumstance that the crime was especially cruel, heinous, and depraved.

The court also found five mitigating circumstances to be present, but ascribed them little weight. Specifically, the court found as mitigating circumstances the fact that Detrich's intoxication significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law, his abusive background, his remorse, his lack of prior

convictions involving violence, and the fact that his intoxication on the night of the murder stemmed from a longstanding history of alcohol and substance abuse. The court found that these mitigating factors were "not sufficiently substantial to outweigh the aggravating circumstances [sic] of having committed this offense in an especially cruel, heinous or depraved manner" and accordingly sentenced Detrich to death.

Detrich again appealed his conviction and sentence to the Arizona Supreme Court. *See Detrich II*, 932 P.2d at 1331. The Supreme Court affirmed Detrich's sentence and convictions. *Id.* at 1340.

## D.   State Petition for Post-Conviction Relief

Detrich filed a petition for post-conviction relief in state court, alleging, among other things, that his trial counsel was ineffective for failing to present mitigating evidence and for failing to present an expert witness to rebut the state's aggravation case. Detrich's post-conviction counsel repeatedly requested funding for an investigator to assist in preparing Detrich's petition for post-conviction relief or, in the alternative, an evidentiary hearing on this request. The court denied the requests and ultimately ruled on the petition without appointing an investigator or holding an evidentiary hearing.

The post-conviction court, however, did grant funding for a neuropsychological expert, Dr. Robert Briggs, who produced a report on Detrich's neuropsychological functioning. The report concluded that Detrich's decision-making, especially when compromised by alcohol, "was not based on any consequence-driven thought process, but rather a leaned [sic] behavior that bypassed right or wrong." According to Dr. Briggs, Detrich's abuse led him to develop a "mindset . . . in which instinct took over and reason could not be accessed." On neuropsychological testing, Detrich performed "in the normal range of psychological function," earning a score of 25 on a scale for which scores between 0 and 26 were normal.

Dr. Briggs's report explained, however, that this represented "a recovered picture," and that "improvement in function occurs as time (and sobriety) from the incidents [of head injuries and drug use] increase." Dr. Briggs further opined that an interaction between Detrich's emotional status and mild neuropsychological deficits likely caused a greater overall impairment in function. Finally, the report concluded, among other things, that, as would be expected given his abusive childhood, Detrich was immature, alienated, self-indulgent, aggressive, impulsive, hostile, resentful, and irritable; that his abusive childhood could have taught him to use violence; and that he may have antisocial or paranoid personality or paranoid disorder. Detrich's post-conviction counsel requested an evidentiary hearing on the neuropsychological findings, explaining that Dr. Briggs could testify that Detrich was brain damaged and impulsive, and that his impulsiveness, combined with the effects of alcohol, constituted mitigating circumstances. The state court denied the request.

This report supplemented other new evidence that counsel presented to the state post-conviction court. As exhibits to the petition for relief, counsel attached statements by Detrich's mother, sister, and step-father that provided additional details about the abuse Detrich suffered as a child, the custody battle between his mother and father, his history of drinking alcohol with his step-father beginning at a young age, and car and motorcycle accidents that he had when he was younger.

In his petition for post-conviction relief, Detrich also contended that his trial counsel was ineffective for failing to present expert pathologist testimony that would have rebutted the state's argument that the crime was especially cruel, heinous, or depraved by showing that Souter did not actually suffer.

After considering Detrich's arguments and the new mitigating evidence, the court summarily denied all of Detrich's claims. The state moved for reconsideration to clarify the court's findings in order to "insulate [them] from unwarranted

federal review." The state submitted a proposed order, which the court adopted as its ruling on the petition for post-conviction relief. The order—the last and only reasoned state-court judgment—dismissed in one paragraph Detrich's claim of ineffective assistance of counsel for failure to present mitigating evidence at the sentencing phase:

> Petitioner has not presented a colorable claim that trial counsel was ineffective at the sentencing stage of the proceedings for failing to have Dr. Briggs, a neuropsychologist, testify on Petitioner's behalf, or to present additional evidence of Petitioner's abusive background. After considering the initial psychological report, the presentence report, a sentencing memorandum, and written statements from Petitioner's sister citing multiple examples of both physical and mental abuse suffered by Petitioner as a child, this Court found statutory and non-statutory mitigating circumstances. Dr. Briggs' report was not significantly different from the report considered by this Court. Indeed Dr. Briggs found that Petitioner's general neuropsychological functioning was normal and showed an absence of cognitive dysfunction. Therefore, there is no reasonable probability that this testimony would have compelled this Court to impose a sentence less than death. Moreover, additional evidence of Petitioner's dysfunctional childhood would have been merely cumulative and was not "newly discovered." This claim is summarily dismissed.

The court similarly dismissed, in one short paragraph, Detrich's claim that his counsel was ineffective for failing to rebut the state's aggravation case:

> Petitioner failed to present a colorable claim that his trial counsel was ineffective in failing to retain an expert to rebut the State pathologist's testimony that the victim could have made "gurgling" sounds in

response to questioning by Petitioner, after sustaining knife wounds to her throat. Contrary to an affidavit submitted by Petitioner, there was no testimony that the victim "engaged in conversation" or was conscious for a long period of time. The victim sustained four serious wounds to the neck, and it is merely speculative to assume that the victim's attempt to respond occurred after the most serious wound. No prejudice accrued to Petitioner, in any event, because evidence other than Charlton's testimony regarding the "gurgling" sounds independently supported a finding of cruelty at sentencing. Petitioner's claim that expert rebuttal testimony would have discredited Charlton's credibility is unavailing, where overwhelming evidence apart from Charlton's testimony supported the finding that Petitioner committed the murder. This claim is summarily dismissed.

In its conclusion, the court further clarified that "the Court finds that neither prong of the *Strickland v. Washington* test has been met as to any claims of ineffective assistance of counsel." Detrich appealed, but the Arizona Supreme Court denied review.

## E.   Federal Habeas Petition

Detrich filed a habeas petition in federal district court on April 29, 2003. The district court dismissed most of Detrich's claims without an evidentiary hearing, including his claim that his counsel was unconstitutionally ineffective at sentencing for failing to present expert evidence to rebut the state's aggravation case. The district court did, however, hold a four-day evidentiary hearing on Detrich's claim of ineffective assistance of counsel at sentencing for failure to investigate and present mitigating evidence. At the hearing, Detrich's new counsel presented eighty-seven exhibits and called six witnesses.

The district court concluded that Detrich's counsel performed deficiently by failing to investigate and present mitigating evidence. The court nonetheless denied relief because it found that Detrich suffered no prejudice from his trial counsel's deficient performance. According to the district court, "despite extensive additional investigation into [Detrich's] background and mental health, [Detrich] has not discovered significant new or more weighty mitigation than was considered by the sentencing judge." Detrich appealed, and the district court granted a certificate of appealability on his claim that trial counsel was ineffective for failing to investigate and present mitigating evidence. We later also granted a certificate of appealability on his claim that trial counsel was ineffective for failing to rebut the state's aggravation case and on the two guilt-phase claims that we addressed in our previously filed memorandum disposition. *See* 392 F.App'x 580 (9th Cir. 2010).

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 2253. We review de novo the district court's denial of Detrich's petition for habeas corpus, and we review the district court's findings of fact for clear error. *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007). Because Detrich filed his federal habeas petition after 1996, the AEDPA governs his action. *Id.*

The AEDPA requires that we defer to the last reasoned state court decision. *Id.* Specifically, 28 U.S.C. § 2254 provides that a federal court may grant a state prisoner's habeas petition with respect to a claim that was "adjudicated on the merits in State court proceedings" only if the state court's adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evi-

dence presented in the State court proceeding. 28 U.S.C. § 2254(d).

For purposes of § 2254(d)(1), "clearly established Federal law" consists only of the holdings, and not the dicta, of Supreme Court opinions as of the time of the state court adjudication on the merits. *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011). However, we can also consider circuit precedent in assessing what constitutes "clearly established" Supreme Court law and whether the state court applied that law unreasonably. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003). Our analysis under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).[3]

A state court decision is "contrary to" federal law under § 2254(d)(1) if it applies a rule that contradicts the governing law set forth in Supreme Court cases or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Terry Williams*, 529 U.S. at 405-06.

A state court decision involves an "unreasonable application" of federal law under § 2254(d)(1) if "the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular

---

[3]Detrich argues for the first time in his supplemental briefing that because the state court ruled on his post-conviction claims without holding an evidentiary hearing, the state court decision necessarily was based on an "unreasonable determination of the facts" under § 2254(d)(2). Because we conclude—using only the state court record—that the state court's decision involved an unreasonable application of federal law and an unreasonable determination of the facts, we do not consider the merits of this argument or whether it was waived.

state prisoner's case" or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The Supreme Court need not have applied a specific legal rule to a closely analogous fact pattern for the state court's decision to constitute an unreasonable application of clearly established federal law because "even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). A state court decision will involve an "unreasonable application" of clearly established federal law, however, only if the state court's decision was "objectively unreasonable," and not merely incorrect. *Terry Williams*, 529 U.S. at 409-10.

Finally, a state court's determination of the facts is "unreasonable" under § 2254(d)(2) only if we are "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record [before the state court]." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

In certain circumstances a federal court may also consider new evidence presented for the first time in the federal proceeding. *See* 28 U.S.C. § 2254(e)(2).[4] As we explain below,

---

[4]Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

if we make an antecedent determination—relying solely on evidence before the state court—that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," *id.* § 2254(d)(1), or that the state court's decision "was based on an unreasonable determination of the facts," *id.* § 2254(d)(2), we proceed to evaluate the petitioner's claim de novo and may then consider evidence that was properly presented for the first time in federal court. *Cf. Pinholster*, 131 S. Ct. at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief.").

## III.  DISCUSSION

Detrich contends that his trial counsel was ineffective because he failed to investigate and present mitigating evidence including social background and expert neuropsychological testimony at the penalty phase.[5] In reviewing this claim, we apply the "clearly established" standard for analyzing ineffective assistance claims that the Supreme Court set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Terry Williams*, 529 U.S. at 391 ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.' "). Under *Strickland*, to prevail on his ineffective assistance of counsel claim, Detrich must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

As the Supreme Court recently explained in *Richter v. Har-*

---

[5]Detrich also contends that his counsel was unconstitutionally ineffective because he failed to offer expert forensic testimony to rebut the state's argument that the crime was especially cruel, heinous, and depraved. Because we conclude that Detrich is entitled to relief based on his counsel's failure to investigate and present mitigating evidence, we do not reach this second claim of ineffective assistance.

*rington*, 131 S. Ct. 770 (2011), however, when a habeas court reviews an ineffective assistance of counsel claim under the AEDPA, the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 785. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 786. Accordingly, "[u]nder § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* At the second step, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

## A.   Deficient Performance

We first consider whether the state court unreasonably applied *Strickland* when it concluded that Detrich's counsel did not perform deficiently by failing to investigate and present mitigating evidence at sentencing.[6] Under *Strickland*, counsel's performance is deficient if, considering all the circumstances, it "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 788. In evaluating counsel's performance as compared to these "prevailing professional norms," we may refer to American

---

[6]Although the state court provided no reasoning to support its conclusion that Detrich failed to establish deficient performance under *Strickland*, its decision nonetheless is entitled to AEDPA deference. *See Richter*, 131 S. Ct. at 784; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) (applying AEDPA deference to a state court decision issued without explanation).

Bar Association ("ABA") guidelines in effect at the time of the representation "as evidence of what reasonably diligent attorneys would do." *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009); *see also Strickland*, 466 U.S. at 688.[7] Our review of counsel's representation is "highly deferential," as we apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel's challenged omission "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. To "satisfy the 'unreasonable application' prong of § 2254(d)(1)," Detrich must "show[ ] that there was no reasonable basis for the [state court's] decision." *Pinholster*, 131 S. Ct. at 1402 (quoting *Richter*, 131 S. Ct. at 784) (internal quotation marks omitted).

**[1]** *Strickland* establishes that, although counsel enjoys "wide latitude . . . in making tactical decisions," counsel also "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 689, 691. The Supreme Court has since made clear that this duty includes an obligation to "conduct a thorough investigation of the defendant's background." *Terry Williams*, 529 U.S. at 396; *see also Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (per curiam) (finding it "unquestioned" that counsel had this duty "under the prevailing professional norms" in 1989). Detrich's trial counsel, Harold Higgins, made no such reasonable investigation here, nor did he make any reasonable strategic decision that made a thorough investigation unnecessary. Indeed, applying AEDPA deference, the Supreme Court has found deficient performance in cases where sentencing counsel did *more* than Higgins. We accordingly conclude that the Arizona post-

---

[7]The Supreme Court has consistently recognized the utility of considering ABA Guidelines in evaluating the reasonableness of attorney performance in ineffective assistance claims. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (characterizing ABA Guidelines as "well-defined norms" and "standards to which we long have referred as 'guides to determining what is reasonable' ") (quoting *Strickland*, 466 U.S. at 688); *Terry Williams*, 529 U.S. at 396.

conviction court unreasonably applied the clearly established federal law of *Strickland* when it concluded that Detrich's sentencing counsel's performance was not deficient.

## 1. No reasonable investigation

Detrich contends that Higgins devoted unreasonably little time to penalty phase preparations, failed to seek reasonably available mitigating evidence, and unreasonably failed to enlist the assistance of a mental health expert. We agree.

**[2]** Higgins did not begin work on Detrich's penalty phase until after the jury's guilty verdict and two weeks before the sentencing hearing. Higgins thus began preparing for the penalty phase even later than the counsel whom the Supreme Court found ineffective in *Terry Williams v. Taylor*, who had delayed penalty phase preparations until a week before *trial*. *Terry Williams*, 529 U.S. at 395. And Higgins's delayed initiation of penalty-phase preparations fell even further below the standards reflected in the ABA guidelines in place at the time, which provided that counsel should begin conducting an investigation relating to the penalty phase of a capital trial immediately upon taking the case. Am. Bar. Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* 11.4.1 (1989), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/National/1989Guidelines.authcheckdam.pdf [hereinafter 1989 ABA Guidelines]. With preparations delayed for so long, Higgins then spent only ten and a half total hours on the penalty phase of Detrich's case.

**[3]** Higgins also did not employ a mitigation investigator, nor did he ask his investigator, who in any event was not qualified to do a life history investigation, to investigate mitigating evidence. At most, the investigator made phone calls to family members, with no response. According to Detrich's sister, Diana Jo Stevens, someone from the defense team contacted her shortly before the sentencing hearing and asked her

simply to write a letter "about David." This fell below the prevailing professional standards as reflected in the 1989 ABA guidelines, which provided that the penalty-phase investigation for a capital trial should "comprise efforts to discover all reasonably available mitigating evidence," by drawing on sources including an interview with the accused, interviews with potential witnesses familiar with the defendant's life history, and expert assistance. 1989 ABA Guidelines at 11.4.1(C), (D).

**[4]** Higgins's minimal investigation cannot be justified by any reasonable reliance on the previous investigation conducted by Detrich's counsel at his first sentencing in 1991 because the first trial counsel's mitigation presentation had proven decidedly ineffective. After considering the minimal mitigating evidence that Detrich's first trial counsel presented, the trial judge found *no* mitigating factors to be present and accordingly sentenced Detrich to death.

**[5]** Higgins's extremely limited mitigation investigation was all the more unreasonable in light of the indications in the PSR, letters from Detrich's sister, and 1985 and 1991 psychological reports—all of which Higgins had seen[8]—that Detrich's past likely contained many mitigating circumstances. These documents put Higgins on notice that Detrich had an extremely troubled childhood involving abuse by his step-mother, alcohol abuse encouraged by his step-father starting at a very young age, a prolonged custody battle between his parents, drug abuse by his mother, and frequent absences from school. Despite this evidence that Detrich's background contained many mitigating circumstances, Higgins did not investigate further.

**[6]** In this way, Higgins's performance was indistinguish-

---

[8]The 1985 psychological report was attached to the PSR, and Higgins acknowledged at the sentencing hearing that he had seen the 1991 psychological report.

able from the counsel's performance that the Supreme Court found deficient in *Wiggins v. Smith*. In *Wiggins*, the capital defendant's attorneys had failed to investigate thoroughly their client's background, even though their limited investigation had revealed that the defendant's mother was an alcoholic, that the defendant was shuttled from foster home to foster home as a child, that the defendant frequently missed school, and that, at least once, his mother had left him and his siblings alone for days without food. 539 U.S. at 525. Applying AEDPA deference, the Supreme Court held that the state court unreasonably applied *Strickland* in finding counsel's performance adequate. *Id.* at 528-29. According to the Supreme Court, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525. Similarly, here, "any reasonably competent attorney" would have pursued an investigation into Detrich's childhood and the effects his childhood traumas had on him. Higgins's failure to do so fell below professional standards under any reasonable application of *Strickland*.

**[7]** Compounding this deficiency, Higgins's failure to consult a mental health expert also fell below professional standards. The 1989 ABA guidelines provided that an attorney "should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation." 1989 ABA Guidelines at 11.4.1(D)(7)(D). According to the 1989 guidelines, counsel should consider enlisting experts "to provide medical, psychological, sociological or other explanations for the offense(s) for which the client is being sentenced [and] to give a favorable opinion as to the client's capacity for rehabilitation." *Id.* at 11.8.3(F)(2). In addition, counsel should consider presenting expert testimony concerning the defendant's medical, family, and social history "and the resulting impact on the client, relating to the offense." *Id.* at 11.8.6(B)(8).

**[8]** Higgins did not provide *any* expert mental health evaluations to the court, much less use them to bolster his mitiga-

tion case; he presented no live testimony by any mental health expert, court-appointed or otherwise; and he admits that he did not enlist the assistance of any mental health professional. Indeed, the only expert mental health reports before the sentencing judge were two 1985 evaluations by a state psychologist and psychiatrist that were attached to the PSR and a 1991 court clinic psychologist's evaluation that the state had provided the court.[9] In other words, Detrich's counsel presented no expert mental health evidence at all. The fact that the sentencing judge had the 1985 and 1991 reports to consider did not excuse this failure; Higgins could not reasonably rely on these reports because they were not conducted by partisan experts. *Lambright v. Schriro*, 490 F.3d 1103, 1120-21 (9th Cir. 2007) ("Counsel may not rely for the development and presentation of mitigating evidence on the probation officer and a court appointed psychologist. . . . The responsibility to afford effective representation is not delegable to parties who have no obligation to protect or further the interests of the defendant."). What is more, those reports were not based on a full account of Detrich's background and thus could not provide an "accurate profile of the defendant's mental health." *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (noting that counsel have "an affirmative duty" to provide background information to mental health experts).

[9] Detrich's counsel's performance thus was strikingly similar to, or even worse than, the performances found deficient even after applying AEDPA deference in *Terry Williams* and *Wiggins*.[10] We are mindful of the considerable deference

---

[9]The 1985 reports had been produced in connection with Detrich's earlier incarceration for writing worthless checks. The 1991 report was produced by a psychologist at a state-run clinic at the request of the attorney who represented Detrich in his first trial for Souter's murder.

[10]Higgins's performance was also considerably worse than the performance found competent in *Pinholster*. Unlike Higgins, Pinholster's attorney "investigated mitigating evidence . . . [l]ong before the guilty verdict" and employed a mitigation investigator who "researched epilepsy and also

that we must apply to the state court's decision that Detrich's counsel performed adequately. On the other hand, however, we can not ignore the Supreme Court's holdings in *Terry Williams* and *Wiggins*. In light of this precedent, we must conclude that Detrich's counsel's failure to conduct a more thorough mitigation investigation and to enlist the assistance of a mental health expert constituted deficient performance under *Strickland*, and that the state court decision to the contrary constituted "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Richter*, 131 S. Ct. at 786-87, unless special considerations made a thorough mitigation investigation unnecessary in this particular case.

## 2. No reasonable decision that made a thorough investigation unnecessary

**[10]** In some circumstances, a less-than-thorough mitigation investigation can nonetheless satisfy constitutional requirements if it is based on "a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The state contends that Higgins reasonably decided not to pursue a mitigation investigation here (1) because Detrich did not want to involve his family, and (2) because Higgins reasonably chose to pursue a residual doubt strategy that did not require a thorough mitigation investigation. We conclude that neither of these considerations justified limiting the mitigation investigation.

---

interviewed Pinholster's mother [and] prepar[ed] Pinholster's brother . . . who provided some mitigation testimony during the guilt phase." 131 S. Ct. at 1404-05 (footnotes omitted). Moreover, Pinholster's attorney's timesheets indicated that—unlike Higgins—Pinholster's attorney worked consistently for several months prior to the penalty phase. Finally, unlike Higgins, Pinholster's attorney obtained a psychiatric expert to testify on Pinholster's behalf. *Id.* at 1405.

**a**

**[11]** Detrich's purported desire not to involve his family, and his family's alleged unavailability, did not justify limiting the mitigation investigation for three reasons. First, the record does not show that Detrich in fact discouraged Higgins from contacting his family. While the PSR and a letter from Detrich's sister indicate that Detrich did not want to involve his family in the first sentencing, nothing indicates that Detrich felt the same way during his second sentencing, after having received one death sentence.

Second, even if Detrich did not want to involve his family, or if his family was uncooperative, that would not excuse Higgins's failure to seek expert assistance to explain the mitigating evidence that was known or his failure to seek evidence from other sources, such as medical records and records from Detrich's parents' custody battle. Indeed, even where a defendant is "actively obstructive," counsel must investigate available records. *See Rompilla*, 545 U.S. at 381, 383, 389 (holding that the state court's conclusion that counsel did not perform deficiently was "objectively unreasonable" under the AEDPA).

Third, even if Detrich's desire not to involve his family in his first sentencing could reasonably be understood as an instruction not to present any mitigation case at all—which we doubt it could—such an instruction would not excuse counsel from conducting a thorough mitigation investigation. "A defendant's insistence that counsel not call witnesses at the penalty phase does not eliminate counsel's duty to investigate mitigating evidence or to advise the defendant of the potential consequences of failing to introduce mitigating evidence, thereby assuring that the defendant's decision regarding such evidence is informed and knowing." *Williams v. Woodford*, 384 F.3d 567, 622 (9th Cir. 2004). Although a defendant's informed wishes can justify failing to *present* mitigating evidence, it cannot justify failing to *investigate* such

evidence because counsel retains a duty to inform his client about the risks and potential benefits of presenting a mitigation case. *See id.*

**b**

**[12]** Detrich's counsel's sentencing-phase strategy of emphasizing residual doubt about whether Detrich had actually committed the murder likewise did not make a thorough mitigation investigation unnecessary. First, the record reveals that Higgins made no strategic choice to emphasize residual doubt to the exclusion of a classic mitigation presentation here. The fact that Higgins presented a limited mitigation case to the sentencing court corroborates this claim. *See Wiggins*, 539 U.S. at 526 (reasoning that counsel's presentation of a "halfhearted mitigation case" demonstrated that the failure to put on a stronger mitigation case was not a strategic choice).

Second, even if Higgins had made such a strategic choice, that choice would not have been reasonable. The Supreme Court has made clear that the investigation supporting a decision not to introduce mitigating evidence must be reasonable because a thorough investigation is necessary to make "a fully informed decision with respect to sentencing strategy." *Wiggins*, 539 U.S. at 523, 527. Where a strategic choice is made " 'after less than complete investigation,' " a court must defer to that choice "only to the extent that 'reasonable professional judgments support the limitations on investigation.' " *Id.* at 533 (quoting *Strickland*, 466 U.S. at 690-91). As explained above, Higgins did not reasonably limit the investigation here because the information that Higgins knew about Detrich's past would have led "any reasonably competent attorney" to pursue further investigation. *See id.* at 525. Because it would not have been supported by a reasonable investigation, a strategy focusing on residual doubt to the exclusion of a classic mitigation defense would not have been reasonable.

**[13]** Moreover, we doubt that such a strategy would have been reasonable here, even if supported by an adequate investigation. Where a judge is likely to find an aggravating factor that would make the death penalty mandatory in the absence of sufficient counterbalancing mitigating evidence, counsel's failure to make a strong mitigation case falls short of professional standards. *Summerlin v. Schriro*, 427 F.3d 623, 640 (9th Cir. 2005). Here, in light of the fact that the previous sentencing judge had found that the crime was especially heinous, cruel, or depraved, it was likely that the sentencing judge would find such an aggravating factor. And under Arizona law at the time, the presence of this factor required imposition of the death penalty unless the sentencing court found mitigating circumstances substantial enough to outweigh it. Ariz. Rev. Stat. § 13-703. Under *Summerlin*, professional standards therefore required Higgins to present a strong mitigation case. He did not. Indeed, he did little to supplement the mitigation case from Detrich's first sentencing that had led the first sentencing judge to find *no* mitigating factors, much less sufficiently weighty ones. The only new evidence Higgins offered in support of leniency were the three letters from Detrich's sister.[11]

**[14]** For these reasons, no special consideration justified Higgins's failure to pursue a thorough mitigation investigation here. Neither Detrich's purported wish not to involve his family nor his counsel's purported strategic choice to pursue a residual doubt strategy at sentencing made a thorough mitigation investigation unnecessary. Higgins's performance was

---

[11]The state argues that Higgins's performance was adequate because "[t]he main thrust of Higgins's mitigation strategy . . . was residual doubt." We disagree. Even assuming that Higgins employed a reasonable strategy in focusing his sentencing argument on residual doubt, it was clearly established in *Strickland* that Higgins was nonetheless required to make a reasonable mitigation investigation or to make the determination that such an investigation was unnecessary. *Pinholster*, 131 S. Ct. at 1407 (quoting *Strickland*, 466 U.S. at 691).

therefore deficient under *Strickland*, and the state court's decision to the contrary was objectively unreasonable.

## B. Prejudice

**[15]** Having concluded that the state court unreasonably held that Detrich's counsel did not perform deficiently, we must next determine whether the deficient performance prejudiced Detrich's defense. *See Strickland*, 466 U.S. at 687. Under *Strickland*, counsel's performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" of prejudice exists "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome"; indeed, a "reasonable probability" need only be "a probability sufficient to undermine confidence in the outcome." *Id.* In other words, Detrich suffered prejudice if "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. In assessing that probability, we "consider 'the totality of the available mitigation evidence . . .' and 'reweig[h] it against the evidence in aggravation.' " *Porter*, 130 S. Ct. at 453-54 (quoting *Terry Williams*, 529 U.S. at 397-98). In so doing, we do not consider the "idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Strickland*, 466 U.S. at 695.

Though "[s]urmounting *Strickland*'s high bar is never an easy task, . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 131 S. Ct. at 788 (internal quotation marks and citations omitted). A federal habeas court must therefore determine that "[t]he likelihood of a different

result [is] substantial, not just conceivable." *Id.* at 792 (citing *Strickland*, 466 U.S. at 693).

Detrich presented volumes of new evidence of his extremely abusive childhood and new expert assessments of his brain damage and neuropsychological deficits for the first time in federal district court. Without considering this compelling new evidence, however, we first conclude that the state court's determination that Detrich was not prejudiced by Higgins's deficient performance resulted from an unreasonable determination of the facts. We next conduct a de novo prejudice assessment and conclude that there is a reasonable probability that the sentencing judge would have imposed a sentence less than death had Detrich's counsel obtained and presented an expert evaluation of Detrich's neuropsychological functioning.

## 1.   State Court Decision

[16] The only evidence of Detrich's mental health before the sentencing judge was a 1991 psychological evaluation by a court clinic psychologist conducted at the request of Detrich's first counsel and two 1985 reports, one by a state psychologist and the other by a state psychiatrist, from when Detrich was incarcerated for writing worthless checks. These reports provided only a snapshot of Detrich's psychological profile. The 1985 reports mentioned in passing that Detrich was impulsive, noting that he was "an impulsive individual" and that he had "occasional impulsive responses," while the 1991 report indicated to the contrary that a test that could reflect impulsivity was "not elevated." The reports concluded that he had above-average intelligence, with cognitive functioning largely intact. The 1985 reports contradictorily noted that he had poor judgment and that his judgment was "grossly intact." They noted that he externalized problems, was sensitive to rejection, had an impaired ability to relate to others, and had a low tolerance for frustration. The 1991 report concluded that he exhibited antisocial attitudes, beliefs, and

behaviors, and that he had probable antisocial personality disorder.

Had Detrich's trial counsel enlisted the assistance of a neuropsychological expert, he would have been able to offer an evaluation with much greater mitigating weight. The evaluation by neuropsychologist Dr. Briggs that Detrich presented to the state post-conviction court indicated that Detrich suffered neuropsychological deficits and opined that his crime was driven by instinct that grew out of his abusive childhood, not by consequence-driven thought or reason.

[17] The state post-conviction court concluded that there was no "reasonable probability" that this neuropsychological evaluation "would have compelled this Court to impose a sentence less than death." In support of this conclusion, the state court reasoned, "Dr. Briggs' report was not significantly different from the report considered by this Court. Indeed, Dr. Briggs found that Petitioner's general neuropsychological functioning was normal and showed an absence of cognitive dysfunction."

[18] This conclusion was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). To be sure, Dr. Briggs's report did state that Detrich earned scores on two neuropsychological tests that were "in the normal range of neuropsychological functioning." These results, however, in isolation, do not represent Dr. Briggs's medical opinion of Detrich's overall psychological presentation.

To the contrary, the report indicates that Detrich's "normal . . . performance" reflected a "recovered picture," as "improvement in function occurs as time (and sobriety) from the incidents [of head injuries and drug use] increase." Significantly, the report indicated that Detrich scored 25 on the General Neuropsychological Deficit Scale (GNDS), a psychological measure used to differentiate brain-damaged

from normal subjects. The GNDS produces a summary score based on 42 variables that identify the major areas of neuropsychological functioning. Zero to 25 represents "normal" neuropsychological functioning, while a score of 26-40 represents mild impairment. *See* Deborah Wolfson & Ralph M. Reitan, *Cross-Validation of the General Neuropsychological Deficit Scale (GNDS)*, 10 Archives Clinical Neuropsychol. 125, 125-26 (1995). In other words, more than ten years after the crime, at the time of these tests, Detrich's neuropsychological functioning was just one point shy of abnormal. Thus, considering Dr. Briggs's finding of "normal" functioning in context, along with his statement that this represented a "recovered picture," the only reasonable inference is that Detrich's neuropsychological functioning was *not* normal at the time of the crime. Moreover, the report states that Detrich's "mild neuropsychological deficits" represent a "very significant psychological factor" that, when combined with his "emotional status," and when impaired by the effects of alcohol, would cause an "overall greater impairment in function" than Detrich's testing results would indicate.

Dr. Briggs described Detrich's emotional status as the "most significant factor" in his psychological presentation, and noted that his childhood history of abuse and "being taught to fear and hate . . . create[d] an atmosphere where the problem solving process is more 'take advantage of the person before the person does it to me.' " Dr. Briggs commented that "this stance makes perfect sense in the world where adults have and teach no boundaries and no respect, much less sympathy and feelings other than inappropriate touch and abuse."

Dr. Briggs described Detrich's profile as "a natural progression of undersocialized abilities, fear, and action based on instinct." He concluded that, "[g]iven the history," Detrich's "decision-making, especially when compromised by alcohol, was not based on any consequence-driven thought process,

but rather a learned behavior that bypassed right or wrong. . . . [T]he mindset was developed in which instinct took over and reason could not be accessed."

**[19]** As the foregoing reveals, the state court's failure to acknowledge all but an isolated statement in Dr. Briggs's report, and its failure to assess the overall significance of Dr. Briggs's medical opinion, resulted in an unreasonable determination of the facts. We have previously made clear that a state court unreasonably determines the facts when it "overlook[s] or ignore[s] evidence [that is] highly probative and central to petitioner's claim." *Taylor*, 366 F.3d at 1001. Evidence is sufficiently "probative" and "central" if it is "sufficient to support petitioner's claim when considered in the context of the full record bearing on the issue presented in the habeas petition." *Id.* Dr. Briggs's conclusion that Detrich was functioning within a "mindset" that "bypassed right or wrong" and "in which instinct took over and reason could not be accessed" is central to Detrich's claim. As we explain at length below, if an expert would have testified about such abnormality at the sentencing, there is a reasonable probability that Detrich would not have received the death penalty. The "state court's failure to consider, or even acknowledge" this highly probative evidence therefore "casts serious doubt on the state-court fact-finding process and compels the conclusion that the state-court decision[ ] [was] based on an unreasonable determination of the facts." *Id.* at 1005.[12]

---

[12]The dissent suggests that since the state habeas court "stated that it considered the Briggs report . . . we should accept that representation at face value." Dissent at 4612. We disagree. As we have discussed at length, Dr. Briggs's report was qualitatively different than the psychological evidence before the trial court, and indicated that Detrich suffered from neuropsychological deficits that contributed to his crime. In endorsing the state habeas court's conclusion that Dr. Briggs's report was cumulative, the dissent commits the same fatal error as that court: it seizes on an isolated statement to justify its conclusion. While we would not, as the dissent suggests, require state habeas courts to list every piece of evidence present in the record, we do expect that, where conflicting material evidence is present, state habeas courts will not ignore such evidence entirely. We believe that our conclusion is consistent with our duty to defer to our state court colleagues. *See Richter*, 131 S. Ct. at 786-88.

## 2. De Novo Prejudice Assessment

[20] We proceed to consider whether there is a reasonable probability that Detrich's sentencing counsel's failure to seek and introduce expert neuropsychological evidence prejudiced Detrich's defense. As an initial matter, we must first determine whether we must continue to apply AEDPA deference after having concluded that the state court's decision was "based on an unreasonable determination of the facts" under § 2254(d)(2). We conclude that the AEDPA imposes no such requirement.

The Supreme Court has made clear that "[w]hen a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied[, and a] federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953. In *Panetti*, the Supreme Court considered a post-AEDPA habeas petition by a prisoner alleging that he was incompetent to be executed. *Id.* at 934-35. In reviewing this claim, the Court first concluded that the state court had unreasonably applied clearly established law in implicitly concluding that it had offered constitutionally adequate procedures to resolve the prisoner's claim of incompetence. *Id.* at 952-53. Because the state court's determination of the merits of the prisoner's competency claim depended on those clearly inadequate procedures, the Supreme Court did not defer to that determination, but rather considered the merits de novo. *See id.* at 954.

We see no reason why our approach should differ where a state court's adjudication of a claim is dependent on an antecedent unreasonable determination of fact. Under § 2254(d), the unreasonable determination of fact alone authorizes a federal court to grant habeas relief—provided, of course, that the petitioner's constitutional rights were in fact violated. Section 2254(d) is phrased in the disjunctive: we may grant relief only if the state court decision was contrary to or involved an

unreasonable application of clearly established Supreme Court law *or* if the state court decision was based on an unreasonable determination of fact. *See* 28 U.S.C. § 2254(d). Section 2254(d)'s plain language therefore does not require that a state court decision involve *both* an unreasonable determination of fact *and* an unreasonable application of law before we may grant relief.

**[21]** We therefore hold that, when a state court adjudication is based on an antecedent unreasonable determination of fact, the requirement set forth in § 2254(d) is satisfied, and we may proceed to consider the petitioner's claim de novo. The Eleventh Circuit, in a recent en banc decision with only one judge dissenting on an unrelated issue, agrees, and we have found no case from any other circuit that holds otherwise. *See Jones v. Walker*, 540 F.3d 1277, 1288 & n.5 (11th Cir. 2008) (en banc); *Cooper v. Secretary, Dept. of Corrections*, 646 F.3d 1328, 1352-53 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant to a claim, we do not owe the state court's findings deference under AEDPA, and we apply the pre–AEDPA de novo standard of review to the habeas claim.") (citing *Jones*, 540 F.3d at 1288 n. 5) (internal quotation marks omitted); *Green v. Nelson*, 595 F.3d 1245, 1251 (11th Cir. 2010) (finding that state court unreasonably determined the facts under § 2254(d)(2) and applying de novo review).

This understanding is consistent with the principle of deference. Because we do not know what the state court would have decided had it applied the law to the correct facts, there is no actual decision to which we can defer. Continuing to apply AEDPA deference even after concluding that the state court had unreasonably determined the facts to which it applied the law would therefore require us to assess the reasonableness of a decision that the state court never actually reached. Yet it is beyond question that the AEDPA does not require us to defer to such hypothetical decisions. For instance, on several occasions, the Supreme Court has consid-

ered ineffective assistance of counsel claims under the AEDPA in cases where the relevant state courts had not reached one of the two *Strickland* prongs. *See Porter*, 130 S. Ct. at 452; *Rompilla*, 545 U.S. at 390. In those cases, the Supreme Court did not ask whether it *would have* been objectively unreasonable for the state court to decide the unreached *Strickland* prong adversely to the habeas petitioner, but rather reviewed that prong de novo, as there was no actual state court decision to which it could defer. *Porter*, 130 S. Ct. at 452; *Rompilla*, 545 U.S. at 390. Like the state courts that never reached one of the *Strickland* prongs in those cases, the state court here similarly never considered whether Detrich's defense was prejudiced by his counsel's failure to present expert evidence of Detrich's *abnormal* neuropsychological functioning. We therefore likewise examine this question de novo.

As another threshold matter, we must determine whether we may consider evidence that Detrich presented for the first time in federal court in analyzing whether Higgins's deficient performance prejudiced the defense. The Supreme Court has explained that 28 U.S.C. § 2254(e)(2), which constrains the federal courts' discretion to conduct evidentiary hearings on habeas claims, "continues to have force where § 2254(d)(1) does not bar federal habeas relief." *Pinholster*, 131 S. Ct. at 1401, 1400 n.5 ("[Section] 2254(e)(2) should be interpreted in a way that does not preclude a state prisoner, who was diligent in state habeas court and who can satisfy § 2254(d), from receiving an evidentiary hearing."). We see no reason to take a different approach where, as here, § 2254(d)(2) does not bar federal habeas relief. We therefore conduct our prejudice inquiry by considering all of the evidence that was properly before the district court.

**[22]** Evaluating Detrich's claim of prejudice de novo, we conclude that, had his trial counsel presented expert neuropsychological evidence, there is a "reasonable probability" that Detrich would have received a sentence less than death, par-

ticularly in light of the sentencing scheme in effect at the time. Under Arizona law at the time of Detrich's sentencing, the sentencing judge had to "weigh the mitigating circumstances against the aggravating circumstances to determine if leniency is required." *State v. Gretzler*, 659 P.2d 1, 13 (Ariz. 1983) (internal quotation marks and citation omitted). The law enumerated ten aggravating factors whose presence would require imposition of the death penalty unless the judge also found "mitigating circumstances sufficiently substantial to call for leniency."[13] Ariz. Rev. Stat. § 13-703(E), (F). In weighing the aggravating and mitigating factors, "the number of aggravating and mitigating circumstances is not dispositive, but rather their gravity." *Gretzler*, 659 P.2d at 13. In Detrich's case, expert evidence demonstrating that he suffered from neuropsychological dysfunctions would have affected the "gravity" of the circumstances on both sides of the balance: it would have not only strengthened the mitigating circumstances, but also weakened the aggravating factor—that the crime was especially cruel, heinous, and depraved—that authorized Detrich's death sentence. We are therefore convinced that there is a reasonable probability that Detrich would have received a more lenient sentence had his trial counsel presented such evidence.

### a

In analyzing Detrich's claim of prejudice, we may rely on Dr. Briggs's report—which was presented as part of Detrich's state post-conviction record—as well as any new evidence that Detrich properly presented for the first time in federal court. In particular, we may consider new evidence so long as

[13]The statute enumerated five mitigating circumstances, but also authorized sentencing judges to consider other, non-statutory mitigating factors. Ariz. Rev. Stat. § 13-703(G); *accord State v. Castaneda*, 724 P.2d 1, 12 (Ariz. 1986) ("[The statute] lists some mitigating circumstances though the court is not limited to those listed but must set forth any mitigating factor which might call for leniency.").

two conditions are met: First, Detrich must have been "diligent in his efforts" to develop the evidence in state court. *Michael Williams v. Taylor*, 529 U.S. 420, 435 (2000); *accord Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam) (holding that new evidence can be considered so long as the petitioner "was not at fault in failing to develop that evidence in state court"). Second, the new evidence must not so "fundamentally alter the legal claim already considered by the state courts" as to render it unexhausted. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Here, Detrich exercised diligence by presenting the state court with evidence of neuropsychological impairment and requesting a hearing to develop that evidence further. *See Michael Williams*, 529 U.S. at 437 ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."). He is not to blame for the state court's denial of that request.

Nor does the new evidence render Detrich's ineffective assistance of counsel claim unexhausted. "[N]ew factual allegations do not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts.' " *Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (internal quotation marks and citation omitted). The new evidence that Detrich presents does not. Detrich provided the state court with a neuropsychological expert's initial analysis indicating that his neuropsychological deficits, emotional state, and substance abuse resulted in a mindset where instinct controlled his actions and reason could not be accessed. Moreover, his post-conviction counsel specifically informed the state court that "complete" testing could show a biological cause of Detrich's impairments, and requested a hearing at which evidence of Detrich's brain damage could be developed. The new evidence presented in federal court simply offers details about Detrich's brain damage, the biological causes of his impairments, and his impaired ability to func-

tion. The new evidence thus does not "fundamentally alter" Detrich's claims, and the state court had "a meaningful opportunity to consider" them. *Vasquez*, 474 U.S. at 257. Particularly because the failure to present the new evidence to the state court "stemmed from the state courts' refusal to grant [the petitioner] an evidentiary hearing on the matter, rather than from any failure of diligence on his part," the new evidence does not render Detrich's claim unexhausted. *Weaver*, 197 F.3d at 364.

We therefore consider, in addition to Dr. Briggs's report, the new evidence that Detrich presented in the district court, which included eighty-seven exhibits and the testimony of six witnesses.

**b**

As discussed at length above, Dr. Briggs's report provided qualitatively new information that the sentencing judge did not consider. That evidence indicated for the first time that the crime may have been driven by an instinctive, learned behavior that stemmed from Detrich's abusive past and neuropsychological deficits. This expert evidence would have added significant mitigating weight. As noted, Dr. Briggs explained that Detrich's abusive background, neuropsychological deficits, and substance abuse caused him to develop a mindset "in which instinct took over and reason could not be accessed." Dr. Briggs's analysis thus explains both the mindset that led Detrich to commit this crime and the cause of that mindset.

By suggesting a "causal nexus" between Detrich's abusive childhood and the crime, this expert analysis could "impact 'the quality and strength of the mitigation evidence.' " *State v. Tucker*, 160 P.3d 177, 201 (Ariz. 2007) (quoting *State v. Newell*, 132 P.3d 833, 849 (Ariz. 2006)). We have repeatedly noted that expert testimony like this can offer a powerful explanation of a defendant's crimes, and that the failure to introduce such evidence can therefore prejudice a defendant.

In *Douglas v. Woodford*, we held that counsel's failure to present expert testimony explaining the possible causal link between the defendant's childhood and his crime was prejudicial. *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003). Although counsel had argued that the defendant's disadvantaged childhood had created a "demon" within him that had contributed to the crimes, that argument "lacked force without some expert testimony to back it up." *Id.* Similarly, in *Caro v. Calderon*, we held that counsel may have prejudiced the defendant where he failed to present expert testimony "to explain the ramifications" of the defendant's life experiences on his behavior. *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999). There is a reasonable probability that Detrich's counsel's failure to provide available expert testimony about how Detrich's abusive childhood influenced his psychological development and contributed to his crime likewise prejudiced Detrich's defense.

Second, Dr. Briggs's report not only offers an expert explanation of the causal link between Detrich's horrific childhood and his crime, but also indicates that his neuropsychological deficits contributed to the crime. In addition to revealing that Detrich's neuropsychological functioning was almost certainly deficient at the time of the crime, Dr. Briggs's report also explains that Detrich's neuropsychological deficits interacted with his emotional status to cause "a greater overall impairment in function" and that being under the influence of drugs and alcohol further inhibited Detrich's abilities. These findings underscored Dr. Briggs's conclusion that Detrich's mindset was such that his actions were instinctual, not reasoned. The neuropsychological deficits Dr. Briggs described would likely have had greater mitigating weight than the diagnoses reflected in the psychological reports that the sentencing judge considered, which reached conflicting conclusions about Detrich's impulsivity. *See State v. Walton*, 769 P.2d 1017, 1034 (Ariz. 1989) (explaining that "some types of [mental] impairments clearly bear more weight than others," and that "personality disorders have not sufficed to tilt the

balance in favor of leniency"). There is therefore a reasonable probability that the failure to introduce such expert evidence prejudiced Detrich's defense.[14]

**[23]** Moreover, expert analyses presented to the federal district court confirm that Detrich's neuropsychological deficits may have contributed to Detrich's crime in this way. The expert testimony that Detrich presented to the federal district court provides significant new details about Detrich's neuropsychological deficits, their behavioral effects, and their causes. Particularly considering this new evidence, we are left with no doubt that, had Detrich's trial counsel enlisted the assistance of a mental health expert, there is a reasonable probability that Detrich would have received a sentence less than death.

**[24]** In the district court, Detrich presented the expert opinion of neuropsychiatrist Dr. Amezcua-Patiño, who diagnosed Detrich with cognitive disorder secondary to congenital deficits and concluded that Detrich has "severe Neuro Psychiatric conditions that he acquired at birth, most likely as a result of Congenital malformations, worsened by significant abuse and neglect, and eventually further deteriorated by the use of drugs and alcohol." Dr. Amezcua-Patiño opined that Detrich's abnormal cognitive functioning "directly affected [his] ability to problem solve and control his actions . . . , including during

---

[14]The dissent suggests that we have attempted to shoehorn Detrich's claim into § 2254(d)(2) to avoid the doubly deferential review we must apply under § 2254(d)(1). *See Richter*, 131 S. Ct. at 788. Not so. The dissent concedes that "had the state court mischaracterized [Dr. Briggs's] report or fatally misinterpreted it . . . it would have been unreasonable." Dissent at 4609-10. This is precisely what the state habeas court did in this case. Dr. Briggs's report was qualitatively different than the psychological reports before the trial court. The report stated, in no uncertain terms, that Detrich "could not" form reasoned decisions at the time he committed his crime. There is no escaping the fact that the state habeas court's utter disregard for all but an isolated statement in Dr. Briggs's report therefore resulted in an unreasonable determination of fact.

the commission of [his] crimes," and "affected his ability to appreciate the wrongfulness of his actions." Another doctor, Dr. Froming, similarly noted damage in the frontal-subcortical areas of functioning, which resulted in impulsivity, impulsive errors, and problems in self-monitoring. Dr. Froming also described Detrich as "very fast responding with an inability to stop once he had started on something." Dr. Cuniff, a medical geneticist, similarly noted that when Detrich attempted a difficult task, he often would not abandon an ineffective strategy. According to Dr. Froming, when "[u]nder the influence of alcohol and other drugs, Mr. Detrich's ability to inhibit, plan ahead, make decisions, and perform in an error-free fashion would be significantly reduced, especially given his neurological damage." Dr. Froming even remarked that Detrich's behavior during the testing "was so extraordinary that I have not witnessed it in any of my previous evaluations since 1979." Finally, she opined that Detrich's functioning would have improved over time as he remained sober, indicating that Detrich's functioning would have been even more impaired at the time of the crime.

[25] All of these expert analyses indicate how Detrich's deficits could have affected his behavior in a way that could explain his crime: cognitive deficits caused him to act impulsively and impaired his ability to control his actions. Such an explanation could have significant mitigating weight. As the Supreme Court has recognized, evidence that a defendant's "violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation" could alter the selection of a penalty. *Terry Williams*, 529 U.S. at 398. Evidence that such a compulsive reaction stemmed from neuropsychological deficits would have even greater mitigating force. *Cf. Caro*, 280 F.3d at 1258 (holding that the failure to introduce evidence of physiological defects that can cause "impulse discontrol" can prejudice a defendant because such evidence could reduce a defendant's "moral culpability").

Dr. Amezcua-Patiño also offered more detail on how Detrich's abusive childhood could have led to his neuropsy-

chological deficits. The development of the prefrontal cortex —which controls reasoning, problem solving, motivation, and response flexibility—is "vitally dependent on reciprocal interactions with an emotionally attuned caregiver." Abuse impedes the normal development of the brain and likely leads to an underdeveloped cortex and a hyperactive response to stress. Extreme stress interferes with the functioning of the thinking part of the brain that is "particularly important in inhibiting the stress response." By establishing another causal link between Detrich's abusive childhood and his crime, this evidence would have increased the mitigating weight of Detrich's horrific childhood. *See Tucker*, 160 P.3d at 201.

In sum, had Detrich's sentencing counsel consulted a mental health expert to assist in the penalty phase of Detrich's second trial, he would have been able to present expert analyses showing how both neuropsychological deficits and Detrich's abusive childhood contributed to his crime. Had the sentencing judge heard such testimony, there is a reasonable probability that he would have afforded more weight to the mitigating circumstances.

The fact that the state has presented experts who disagree with Detrich's experts' analyses does not alter our conclusion. As the Supreme Court recently recognized, even where state experts identify problems with the tests and conclusions of defense experts, "it [is] not reasonable to discount entirely the effect that [the expert's] testimony might have had on the jury or the sentencing judge." *Porter*, 130 S. Ct. at 455.

Further, this is not a case where expert testimony is unnecessary because laypeople can easily understand the mitigating evidence without assistance. Recently, in *Wong v. Belmontes*, the Supreme Court held that a defendant did not suffer prejudice from his attorney's failure to introduce expert testimony about how the defendant's childhood could have contributed to his crimes because "the body of mitigating evidence . . . was neither complex nor technical. It required only that the

jury make logical connections of the kind a layperson is well equipped to make." *Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009). In *Belmontes*, however, the mitigating evidence was not about brain development and cognitive impairments, but rather about how traumas the defendant experienced as a child "caused him to 'los[e] ground in comparison with his peers [both] academically [and] socially' and 'intensified [his] sense of himself as defective, something from which he never recovered.' " *See Belmontes v. Ayers*, 529 F.3d 834, 853 (9th Cir. 2008), *rev'd*, 130 S. Ct. 383. Whereas a jury can use "its common sense or own sense of mercy," *Belmontes*, 130 S. Ct. at 588, to understand the psychological impact of an abusive childhood, a sentencer would likely need expert testimony to understand how a traumatic childhood could shape brain development in a way that would lead to impulsive behavior. Because expert testimony would provide additional explanations beyond a layperson's understanding of Detrich's inability to curb his impulses, there is a reasonable probability that this testimony would have increased the weight of the mitigating evidence.

**c**

**[26]** In addition to strengthening the mitigating evidence, the expert evidence of Detrich's neuropsychological dysfunctions would have weakened the statutory aggravating factor that the sentencing court found to authorize imposition of the death penalty, i.e., that Detrich's crime was especially cruel, heinous, and depraved. Under Arizona law, "cruelty involves the pain and distress visited upon the victims, and . . . heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions." *Gretzler*, 659 P.2d at 10. Based on the evidence before it, the sentencing court found that the number and severity of wounds, some of which were defensive, showed that the crime was especially cruel, and that Detrich's words and actions at the time of the crime evidenced a heinous and depraved state of mind. For the reasons we explain below, evidence of Detrich's neurop-

sychological deficits could have provided an alternative explanation of Detrich's words and actions and accordingly could have decreased the weight of the "especially cruel, heinous, and depraved" aggravating factor.

To be sure, evidence of Detrich's neuropsychological dysfunctions would not bear on the cruelty of the crime, which focuses on the victim's suffering. *See id.* at 10. Because there is therefore no reasonable probability that this expert evidence would have led the sentencing court to find no aggravating circumstances whatsoever, the death penalty would have remained an option. *See* Ariz. Rev. Stat. § 13-703(E), (F). Nonetheless, under Arizona law, sentencing judges look not only to whether an aggravating circumstance is present, but also to the weight of that aggravating circumstance. *See State v. Canez*, 42 P.3d 564, 596 (Ariz. 2002) (assessing the weight of the (F)(6) aggravating circumstance after reversing the finding of heinousness and depravity but upholding the finding of cruelty); *State v. Gulbrandson*, 906 P.2d 579, 604 (Ariz. 1995) (noting that "[t]he (F)(6) aggravating circumstance would have even more weight if defendant had relished the murder"). Thus, even assuming that Detrich could not successfully rebut the state's argument that the murder was especially cruel, the neuropsychological evidence could diminish the weight of the aggravating factor by showing that the crime was not especially heinous and depraved.

Contrary to the district court's understanding, the heinous/depraved inquiry turns on the defendant's subjective state of mind, not on his mere words and acts. The Arizona Supreme Court has made clear that, to determine whether a crime was committed in an especially heinous or depraved manner, a court must consider "the killer's state of mind at the time of the offense," which "may be shown by his behavior." *State v. Lujan*, 604 P.2d 629, 636 (Ariz. 1979); *accord State v. Fulminante*, 778 P.2d 602, 620 (Ariz. 1988) ("The terms 'heinous' and 'depraved' focus upon a defendant's state of mind at the time of the offense, as reflected by his words and

acts.”); *State v. Martinez-Villareal*, 702 P.2d 670, 680 (Ariz. 1985) (“In order to determine depravity the court must focus on defendant’s state of mind. Defendant’s state of mind may be inferred from behavior at or near the time of the offense.” (citation omitted)). Because this factor focuses on a defendant’s subjective state of mind, expert psychiatric evidence can demonstrate that a defendant’s crime was not especially heinous or depraved. *See Summerlin*, 427 F.3d at 641-42 (holding that counsel’s failure to present psychiatric evidence of a defendant’s “lack of impulse and emotional control and organic brain dysfunction” prejudiced the defendant because that evidence “could directly counter . . . that the crime had been committed in a ‘heinous, cruel, or depraved manner’ ”).

The Arizona Supreme Court has identified five factors that can lead to a finding of heinousness or depravity: the defendant’s relishing of the murder, infliction of gratuitous violence, mutilation of the victim, senselessness of the crime, and helplessness of the victim. *Gretzler*, 659 P.2d at 11. In Detrich’s case, the sentencing judge found that four of the five factors—all but mutilation—were present. According to the sentencing judge, Detrich’s asking Charlton if he wanted “a shot” at the “dead” but “warm” body indicated that Detrich relished the crime. The forty wounds evidenced gratuitous violence. And the crime was senseless in that the victim posed no threat to Detrich, and the victim was helpless. These factors led the sentencing judge to conclude that the crime was especially heinous and depraved.

[27] Expert testimony could have rebutted the finding that the gratuitous violence and Detrich’s apparent relishing of the crime evidenced a heinous and depraved state of mind. First, expert testimony that Detrich exhibited an “inability to stop once he had started on something,” and that his “ability to inhibit, plan ahead, [and] make decisions . . . would be significantly reduced, especially given his neurological damage,” could have provided the sentencing judge with a different understanding of the victim’s forty wounds. Rather than evi-

dencing a "shockingly evil state of mind," *Gretzler*, 659 P.2d at 11, the sheer number of wounds reflected Detrich's impulsive and persistent behavior, which was caused by his neurological deficits. The state argues that Detrich's brain dysfunctions do not explain the gratuitous violence because there is no evidence that he was out of control, as Detrich apparently directed Charlton to drive out of town, told him to pull over, and later lied that he had been in a fight when his friend asked why he was covered in blood. That Detrich may have regained control after committing the murder, however, does not indicate that he also had control over his impulses while inflicting the wounds.

Second, given the neuropsychological evidence, there is a reasonable probability that the sentencing judge would have concluded that Detrich's comment offering Charlton "a shot" at the dead body evidenced impulsivity and immaturity, not relishing of the killing. Indeed, the Arizona Supreme Court has acknowledged that "post-murder statements suggesting indifference, callousness, or a lack of remorse constitute 'relishing,' only when they indicate, beyond a reasonable doubt, that the killer savored or enjoyed the murder at or near the time of the murder." *State v. Greene*, 967 P.2d 106, 115-16 (Ariz. 1998). The Arizona Supreme Court has, for example, found that a defendant's statement that he had "clubbed" a "faggot," while callous, did not establish relishing. *Id.* at 115. Similarly, that court rejected a finding of relishing where a defendant bragged that his victim had "squealed like a rabbit." *State v. Graham*, 660 P.2d 460, 463 (Ariz. 1983). In that case, the court attributed the defendant's statement not to his savoring of the crime, but to his immaturity and need to impress his peers, which a psychological report had noted. *Id.* Similarly, here, expert analyses would have reported that Detrich was "very immature" and impulsive. These neuropsychological characteristics, explained in part by Detrich's brain development and abusive childhood, could have provided an alternative explanation of Detrich's callous statement to Charlton:

his statement reflected immaturity and impulsivity, not his enjoyment of the act of killing Souter.

Thus, expert testimony about Detrich's neuropsychological dysfunctions could have shed a different light on Detrich's words and actions at the time of the crime. Had the sentencing judge heard expert testimony about Detrich's impulsivity, inability to change a course of action once started, and immaturity, there is a reasonable probability that he would have concluded that the callous statement to Charlton and the number of wounds reflected these neuropsychological characteristics, not relishing or knowing infliction of gratuitous violence that reflected a heinous and depraved state of mind. And there is more than a reasonable probability that this expert evidence would have at least precluded the sentencing judge from finding *beyond a reasonable doubt* that Detrich's actions reflected a heinous and depraved state of mind. *See State v. Jordan*, 614 P.2d 825, 828 (Ariz. 1980) (holding that aggravating circumstances must be proven beyond a reasonable doubt). Moreover, had the sentencing judge not found gratuitous violence or relishing, he almost certainly would not have found the crime to have been especially heinous or depraved, because the other two factors urged by the state—senselessness of the crime and helplessness of the victim—rarely support a finding of heinousness and depravity on their own. *See State v. Hyde*, 921 P.2d 655, 684 (Ariz. 1996).

**[28]** There is therefore a reasonable probability that expert evidence of Detrich's neuropsychological deficits would have changed the aggravation side of the sentencing balance. Because there is a reasonable probability that the sentencing judge would not have found Detrich's crime to be especially heinous and depraved, there is a reasonable probability that he would have afforded less weight to the aggravating factor that authorized imposition of the death penalty here. If the aggravator had less weight, it would of course take less mitigating evidence to outweigh it.

**d**

Had Detrich's trial counsel presented expert evidence of Detrich's neuropsychological dysfunction, there is a reasonable probability that the sentencing judge would have ascribed more weight to the mitigating circumstances and less weight to the aggravating circumstance that the crime was especially heinous, cruel, or depraved. Critically, there is a reasonable probability that these changes in weights on both sides of the sentencing balance would have resulted in a sentence less than death.

[29] This is not a case where the aggravating factors are so overwhelming that a death sentence was all but assured. First, even for very gruesome crimes, the death penalty is not necessarily unavoidable. *Douglas*, 316 F.3d at 1091. Second, we have found that aggravating circumstances are so significant as to preclude a finding of prejudice only where the aggravating circumstances were worse, and the omitted mitigating evidence weaker, than those here. For example, in *Bible v. Ryan*, we held that the severity of the aggravating factors precluded a finding of prejudice where the defendant had kidnaped, stripped, molested, tied up, and murdered a nine-year-old girl, and where the omitted mitigating evidence showed only that the defendant had high fevers as a child that theoretically could have resulted in organic brain damage. *Bible v. Ryan*, 571 F.3d 860, 863-64, 870 (9th Cir. 2009). Here, not only are the aggravating circumstances of Detrich's crime less egregious, but he has offered evidence that he *actually* suffers organic brain damage that could help explain his crime. *Cf. Bible*, 571 F.3d at 871 (emphasizing that the defendant did not contend that he *actually* had organic brain damage in concluding that the failure to introduce this evidence did not prejudice him). The aggravating factors similarly far outweighed the omitted mitigating evidence in *Woodford v. Visciotti*, where the Supreme Court held that the state court was not objectively unreasonable in finding no prejudice where a defendant, who had previously knifed a man and stabbed a

pregnant woman, had committed a pre-planned armed robbery that involved an execution-style killing and another attempted killing. *Woodford v. Visciotti*, 537 U.S. 19, 26-27 (2002). There, the mitigating evidence that counsel failed to present was far weaker than that here: the defendant had been berated as a child, had no self-esteem, moved twenty times growing up, was born with club feet, and suffered from depression, feelings of inadequacy and incompetence, and a possible seizure disorder. *Id.* at 26. Similarly, in *Cox v. Ayers*, we recently found no prejudice where the "weight of the aggravating factors was staggering," as the petitioner had "set out to kill everyone in [a] house, including children sleeping in their beds, . . . for money." *Cox v. Ayers*, 613 F.3d 883, 900 (9th Cir. 2010). Balanced against these "staggering" aggravating factors was "mostly cumulative" evidence of the petitioner's abusive childhood, but no evidence, new or otherwise, of any neuropsychological deficiencies that could explain the crime. *Id.*

[30] Because the mitigating evidence that Detrich's counsel failed to present is powerful, and because the aggravating circumstances surrounding Detrich's crime are not so severe as practically to preclude a finding of prejudice, there is a reasonable probability that the new evidence of Detrich's neuropsychological dysfunctions would have led the sentencing judge to conclude that the mitigating circumstances outweighed the aggravating circumstances and accordingly to impose a sentence less than death.[15]

[31] In sum, Detrich's trial counsel's failure to conduct an adequate penalty phase investigation, and the resulting failure to present powerful available mitigating evidence, deprived

---

[15]Because we conclude that the failure to introduce such expert mental health evidence alone prejudiced Detrich's defense, we need not decide whether Detrich's counsel's additional failure to introduce evidence of Detrich's abusive childhood, his successful adaptation to prison, or the impact that his execution would have on his family also prejudiced him.

Detrich of his Sixth Amendment right to the effective assistance of counsel. The state court unreasonably applied *Strickland* in concluding that counsel's performance was not deficient. Moreover, the state court's conclusion that Detrich's counsel's performance did not prejudice Detrich's penalty-phase defense was based on an unreasonable determination that Dr. Briggs's report indicated that Detrich's neuropsychological functioning was normal. Because available expert neuropsychological evidence that Higgins failed to obtain and present would have provided a powerful explanation of Detrich's crime, we conclude that there is a reasonable probability that Detrich would have received a sentence less than death if Higgins had provided adequate representation.[16] We therefore hold that Detrich is entitled to habeas relief on his penalty phase ineffective assistance of counsel claim.

## IV.   CONCLUSION

For the reasons explained above, we reverse the district court's denial of habeas relief on Detrich's penalty phase ineffective assistance of counsel claim. The case is remanded for

---

[16]We reach this conclusion mindful of the Supreme Court's recent decision in *Richter*. In that case, the Court found that the petitioner had not suffered prejudice where he offered expert evidence that "established nothing more than a theoretical possibility" that his version of events was more plausible than the government's, and "offered no evidence directly challenging" conclusions reached by the government's experts. 131 S. Ct. at 792. Detrich, by contrast, offers expert evidence regarding the nature and extent of his neuropsychological impairments which goes far beyond suggesting a mere theoretical possibility that his impairments contributed to his crime. He also, as we have noted, offers evidence that directly contradicts psychological assessments presented by the government's experts. In short, Detrich presents a markedly different case than Richter, and we do not believe that the same result must inhere. Thus, bearing in mind *Richter*'s strong rebuke of our prior failure to give insufficient deference to our state court colleagues, we remain firm in our conviction that it is reasonably likely that Detrich would have received a sentence less than death had he received adequate representation.

the district court to issue a writ of habeas corpus vacating Detrich's death sentence unless the state re-sentences Detrich within a reasonable time set by the district court. If the state chooses not to re-sentence, Detrich's sentence will automatically be converted to life in prison in accordance with Arizona law.

**REVERSED and REMANDED.**

McKEOWN, Circuit Judge, Dissenting:

I respectfully dissent. I join the majority's conclusion in § III.A that trial counsel was ineffective because he failed to investigate and present sufficient mitigation evidence. I disagree with the majority that Detrich was prejudiced by this failure and that the state court made an unreasonable factual determination. In my view, this case should be analyzed under the legal prong of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1), rather than § 2254(d)(2), the factual prong. Either way, Detrich cannot overcome the prejudice bar in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And, even if Detrich could pass through § 2254(d)'s strict requirements, and we were permitted to consider the expansive new evidence, he nonetheless fails to establish prejudice.

Detrich's appeal focuses on the state post-conviction court's alleged under-weighing of the mitigation evidence that was before that court. This opportunity for another review has caused me to reevaluate our prior conclusion. Upon reconsideration of the facts and in the face of recent Supreme Court decisions, I conclude that the state post-conviction court's prejudice evaluation was not contrary to established federal law. The court appropriately concluded that Detrich could not overcome the aggravating circumstance through his claims of impulsivity, drug and alcohol abuse, and a dysfunctional

childhood. Although his mitigation evidence was presented to the state court, now he wants a "do over" with more extensive psychological and familial evidence. Though in no way do I discount the problems Detrich experienced, they are insufficient in the face of an extraordinarily cruel and heinous murder to establish a reasonable probability that the outcome would have been different had counsel effectively represented Detrich.

The Supreme Court's recent decisions in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), and *Harrington v. Richter*, 131 S. Ct. 770 (2011), both decided after our initial opinion was issued, provide the framework for our analysis. With respect to new evidence and evidentiary hearings in federal habeas petitions challenging state court convictions, *Pinholster* dramatically changed the landscape. The central premise of *Pinholster* is that our review of Detrich's claims under § 2254(d) is circumscribed by the state court record—review "is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398; *see also id.* at 1413 (Sotomayor, J., dissenting) ("New evidence adduced at a federal evidentiary hearing is now irrelevant to determining whether a petitioner has satisfied § 2254(d)(1)."). Since *Pinholster*, courts have grappled with defining the circumstances in which new evidence may be considered. For example, our court reviewed post-*Pinholster* the admissibility of new evidence that was previously unavailable, such as when prosecutors withhold vital information in violation of their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). *See, e.g.*, *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011) (remanding petitioner's *Brady* claim to the district court with instructions to stay the proceedings so that petitioner could return to state court because, despite petitioner's diligence, some exculpatory evidence was not turned over until the federal habeas proceeding).

To be sure, the Supreme Court did not completely close the door on new evidence or evidentiary hearings under 28 U.S.C. § 2254(e)(2). As I wrote in *Stokley v. Ryan*:

> *Pinholster* leaves open the question of how to distinguish between a claim that was exhausted in state court and a claim that is transformed by new evidence into a different and novel contention presented for the first time in federal court. The Court in *Pinholster* also had no occasion to speak to the role that new evidence plays in federal habeas proceedings on those rare occasions when an evidentiary hearing is proper.

659 F.3d 802, 808 (9th Cir. 2011). *See also Pinholster*, 131 S. Ct. at 1411 n.20 (noting that because Pinholster did not meet § 2254(d)(1) on the state court record alone, "we need not decide whether § 2254(e)(2) prohibited the District Court from holding the evidentiary hearing or whether a district court may ever choose to hold an evidentiary hearing before it determines that § 2254(d) has been satisfied.")

Regardless of the fissures left open after *Pinholster*, the Court made abundantly clear that our review under § 2254(d) is limited to the record before the state court. On the state court record, Detrich fails to show that he can surmount the barriers imposed by § 2254(d).

Recognizing that *Pinholster* requires initial review on the basis of the state court record alone, the majority concludes, under § 2254(d)(2), that the state court's prejudice analysis rested on an unreasonable determination of the facts. Maj. Op. at 4577-81. With that conclusion on the table, the majority then goes on to incorporate into its analysis the "volumes" of new evidence offered in the federal habeas proceeding.

I part ways with the majority at this initial juncture. Unlike the majority, I view Detrich's claim as most properly falling within the purview of § 2254(d)(1), and, even if it is viewed as a factual misstep under § 2254(d)(2), Detrich cannot satisfy the prejudice standard. Although restricting itself to the state court record in its analysis of Detrich's claims under

§ 2254(d), the majority inordinately focuses on Dr. Briggs's neuropsychological report. Detrich's appellate counsel obtained funding for the report and, before the state court, advanced the argument that Detrich's impulsivity, coupled with his abusive childhood and substance abuse, were mitigating factors that should have changed the trial judge's mind on sentencing. But the post-conviction court, which was the same judge as the trial court, flatly rejected this argument: "[T]here is no reasonable probability that this testimony [regarding neuropsychological functioning] would have compelled this Court to impose a sentence less than death." The additional evidence of a dysfunctional childhood was deemed cumulative.

In the end, this case mirrors *Pinholster*: As the Court wrote, "There is no reasonable probability that the additional evidence Pinholster presented in his state habeas proceedings would have changed the jury's verdict. The 'new' evidence largely duplicated the mitigation evidence at trial." *Pinholster*, 131 S. Ct. at 1409. Substitute Detrich for Pinholster and the result is the same. This conclusion is compelled by the Court's opinion in *Harrington*. As to prejudice, the Court explained: "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 131 S. Ct. at 791. The Court went on to reiterate its clear standard, explaining that "[i]nstead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* at 792 (citation omitted). Finally, because Detrich cannot overcome the § 2254(d) bar, the circumstances of this case do not permit the extensive new evidence taken into account by the majority.

## A. No Unreasonable Application of Clearly Established Federal Law Under § 2254(d)(1)

Detrich has consistently argued that he is entitled to habeas relief because the state post-conviction court unreasonably

applied the *Strickland* standard. Given the fact-intensive nature of the *Strickland* inquiry, it is understandable that the majority desires to fit its analysis under § 2254(d)(2)—the "unreasonable determination of the facts" prong of the AEDPA. On reflection and careful review of the record, however, I conclude that this case simply does not present the situation where the state court's factual finding was unsupported by sufficient evidence, where the process employed by the state court was defective, or where the state court made no factual finding at all. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). Rather, the post-conviction court's decision turns on the "application of" the prejudice prong of *Strickland*, which constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The majority's ultimate conclusion rests on its disagreement with the state court's determination that Detrich was not prejudiced by his counsel's ineffective assistance. To prevail on his ineffective assistance of counsel claim, Detrich must show both (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Under the prejudice analysis, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Further, our review is "doubly deferential" under the AEDPA, and Detrich must show that it was necessarily unreasonable for the state court to conclude that: (1) he had not overcome the strong presumption of competence; and (2) he had failed to undermine confidence in the outcome of the state court proceeding. *Pinholster*, 131 S. Ct. at 1403 (citation omitted). Detrich makes no such showing.

Our debate centers on the second prong of *Strickland*. Ultimately, I read the majority's position to be that, given the information before the state post-conviction court, the majority would have reached a different outcome. But that is not the

standard imposed by the AEDPA. Even if we disagree with the state court and might have reached a different conclusion as an initial matter, the state post-conviction court's conclusion that Detrich did not establish prejudice was not an unreasonable application of *Strickland. See Harrington*, 131 S. Ct. at 786 (reiterating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

In assessing the prejudice to Detrich, we reweigh the evidence in aggravation against the totality of the available mitigation evidence. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). The sole aggravating circumstance of the murder—that it was "especially heinous, cruel, or depraved" under Arizona Revised Statute § 13-703(F)(6)—is entitled to significant weight. Explaining its conclusion that the murder was especially cruel, the state court noted that Souter, the victim, suffered a slit throat and forty knife injuries to her face, hands, chest, neck, abdomen and thigh, some of which were defensive. *State v. Detrich*, 932 P.2d 1328, 1338-39 (Ariz. 1997). She also suffered blunt force trauma injuries, including bruises on her nose, jaw, and scalp, and scraping and tearing of the lining of her mouth. *Id.* at 1339. That Souter was conscious during some of the attack was evidenced by her gurgling attempts to respond to Detrich's questions. *Id.* at 1338-39. This evidence demonstrated that Souter must have suffered excruciating pain before she died. The court also noted that Souter suffered mentally when she was held at knifepoint and threatened with sexual assault. *Id.* at 1339.

The state court further found that the crime was "especially heinous or depraved" because of the gratuitous violence beyond that necessary to cause death; because Detrich relished in the murder, asking Charlton if he "want[ed] a shot" at the dead body; because the killing was senseless; and because the victim was helpless. *Id.* at 1339. Despite the majority's conclusion to the contrary, nothing before the state

post-conviction court (including Dr. Briggs's report) alters the significance of these facts. Maj. Op. at 4587-89.

The state trial court gave full credence to Detrich's substance abuse problems and dysfunctional childhood. As mitigating factors, the state court found, under Arizona Revised Statute § 13-703(G)(1), that Detrich's capacity to appreciate the wrongfulness of his conduct or conform it to the law was significantly impaired, based on testimony that he was drinking heavily and possibly using cocaine at the time of the crime. The court also found the following non-statutory mitigation: physically and mentally abusive background; remorse; and history of alcohol and drug abuse.

According to *Pinholster*, we look only to the state court record, which includes the following evidence of Detrich's mental health: (1) the 1985 evaluations, one by a state psychologist and the other by a psychiatrist, that were attached to the presentence report; (2) a 1991 court psychologist's evaluation that the state provided to the trial court; and (3) Dr. Briggs's report on neuropsychological functioning, which Detrich's habeas counsel presented in the state post-conviction proceeding. The 1985 psychological report noted Detrich's impulsivity, immaturity, poor judgment, and low tolerance for frustration. Similarly, the 1985 psychiatric evaluation found Detrich's judgment to be grossly intact "with occasional impulsive responses," and remarked that Detrich appeared to become frustrated quickly. Despite these observations, both reports stated that Detrich did not suffer from a thought disorder or from delusional thinking. The 1991 report confirms these conclusions, noting that Detrich did not exhibit any symptoms of a major mental disorder or any other significant psychiatric disturbance and his thought processes were logical and coherent. However, unlike the 1985 reports, the 1991 evaluation did not reflect a high tendency toward impulsivity. Tellingly, together these reports noted that Detrich did not have a history of prior felony convictions or a known significant history of aggressive behavior. As the district court

aptly noted, Detrich's lack of a violent history before the murder undercuts his argument that he could not conform his conduct to the law.

The addition of Dr. Briggs's report did not alter the significance of the other psychological evidence. In line with the other doctors' observations, Dr. Briggs noted Detrich's impulsivity in several areas of the testing session. His examination also revealed no pattern of cognitive dysfunction and that Detrich's neurological functioning was in the normal range, which was a "recovered picture from the reported head traumas and toxic abuse." Dr. Briggs acknowledged that Detrich's appearance of greater overall impairment of function was "likely an interaction between his emotional state and his mild neuropsychological deficits." He ultimately concluded that "decision-making, especially when compromised by alcohol, was not based on any consequence-driven thought process, but rather a learned behavior that bypassed right and wrong."

The majority asserts that "Dr. Briggs's report not only offers an expert explanation of the causal link between Detrich's horrific childhood and his crime, but also indicates that his neuropsychological deficits contributed to the crime." Maj. Op. at 4588. This reading of the report is the majority's gloss on Dr. Briggs's explanation, not what the report actually says. Although Dr. Briggs acknowledges that Detrich developed a mindset "in which instinct took over and reason could not be accessed," Dr. Briggs makes no specific findings as to Detrich's mindset at the time of Souter's murder. More importantly, the Briggs report does not provide a reasonable probability that a factfinder would make such a connection. While Dr. Briggs's report may shed some additional light on Detrich's abusive background and mental health and provide generalized statements about Detrich's impulsive or instinctive behaviors, it does not establish that Detrich could not conform his behavior to the law when he murdered Souter nearly ten years earlier. *See State v. Johnson*, 133 P.3d 735, 750 (Ariz. 2006) ("[T]he weight to be given [to] mental

impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct." (alteration in original) (internal quotation marks and citation omitted)).

Whatever the specific impairments that Detrich may suffer, I agree with the district court's determination that they are "entitled to only minimal mitigating weight because [Detrich] has no history of violence or evidence that the impairments cause aggression, the crime was not impulsive, and the experts agree that [Detrich] is largely cognitively normal with at least an average IQ." Ultimately, as the district court concluded, Detrich "has not proven that he suffers from a mental impairment which is a 'major contributing cause' to his conduct at the time of the crime."

The additional letters from Detrich's family presented in the state habeas proceedings also do not alter the mitigation calculus. Although these letters recount a truly sad story and more fully develop Detrich's abusive childhood and his history of drug and alcohol abuse, this evidence was cumulative and known by the trial court at sentencing. More than one of the mental health evaluations before the state trial court noted the considerable abuse and neglect he suffered, specifically chronicling that Detrich had been chained up, pushed down stairs, held under water in the bathtub, and encouraged to drink alcohol and use drugs as early as eight or nine years old. The sentencing judge specifically accounted for the abuse Detrich suffered and found both statutory and non-statutory mitigating circumstances.

None of the additional documentation made any connection between Detrich's inability to conform his conduct to the requirements of the law at the time of the murder and his troubled childhood, the alcohol and drug abuse, the accidents he suffered, and his psychological or neurological challenges. *See State v. Stanley*, 809 P.2d 944 (Ariz. 1991) (holding that drug and alcohol abuse could not be considered a mitigating

factor where the defendant did not prove by a preponderance of the evidence that his drug and alcohol problem significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law). Looking at the evidence before the state court, as *Pinholster* requires us to do, it was not unreasonable for the state post-conviction court to hold there was no reasonable probability that, if Detrich's counsel had fully investigated and presented the available mitigation evidence, Detrich would not have been sentenced to death. This conclusion was not an unreasonable application of federal law.

## B. NO UNREASONABLE DETERMINATION OF FACT UNDER § 2254(D)(2)

Rather than analyzing the appeal under § 2254(d)(1), the majority rests its decision on a purported unreasonable determination of fact—i.e., that any defect in the state court determination is more properly cognizable under § 2254(d)(2). I disagree. Nonetheless, were this case more appropriately analyzed under § 2254(d)(2), the state court did not make an unreasonable determination of fact. And finally, even if that were so, on a de novo review, Detrich still falls short on the prejudice requirement.

To begin, as we emphasized in *Taylor*, the "unreasonable determination" standard of § 2254(d)(2) is a "daunting standard—one that will be satisfied in relatively few cases." 366 F.3d at 1000. It would, of course, be unreasonable for the state court to fail to account for, or even acknowledge, Dr. Briggs's report *en toto*. "A rational fact-finder might discount [highly probative evidence] or, conceivably, find it incredible, but no rational fact-finder would simply ignore it." *Id.* at 1006. Had the state court not considered the Briggs report, it would have inappropriately diminished the weight of the psychological evidence, which would reveal a major fault in that court's fact-finding process. Or, had the state court mischarac-

terized the report or fatally misinterpreted it, likewise it would have been unreasonable. But that is not what happened here.

At the request of Detrich's counsel, Dr. Briggs provided an extensive, seven-page single-spaced report covering everything from "General Neuropsychological Functioning" to "Symptomatic Patterns" and "Diagnostic Impressions and Neurological Implications." In the face of the extensive report, the majority concludes that because the state court did not explicitly cite to or acknowledge statements in Dr. Briggs's report that could be construed as favorable to Detrich and failed to highlight the finding that Detrich had developed a "mindset" that "bypassed right or wrong" and "in which instinct took over and reason could not be accessed," that court made an unreasonable determination of fact. Such a characterization does not give the state court's determination the deference to which it is entitled. *See Taylor*, 366 F.3d at 999-1000 ("What the 'unreasonable determination' clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues.") The state court's determination must stand unless we are satisfied that "any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.* at 1000.

I don't want to say the majority is nitpicking, but it certainly could be characterized that way. At a minimum, it is fair to say that the majority opinion does cherry pick. *See e.g.*, *Wetzel v. Lambert*, 132 S. Ct. 1195, 1198-99 (2012) (vacating and remanding grant of habeas where circuit court, in finding the state court's determination "patently unreasonable," overlooked some determinations of the state court and "focused solely" on one portion of the state court decision). As for the "recovered picture," Dr. Briggs actually said, "This is a recovered picture from the reported head traumas and toxic abuse." Of course, the head trauma took place long before both the crime and the trial, and the post-conviction court acknowl-

edged the alcohol abuse and credited it as a mitigating factor. The state habeas court's reference that "[Detrich's] neuropsychological functioning was normal," is hardly a misstatement since that is what Dr. Briggs found. The court did not attempt to link that finding with the time of the crime. Overall, the court simply found that "Dr. Briggs'[s] report was not significantly different" from the other reports considered at trial. And it was not, although it added more texture and detail.

The district court reached the same conclusion; it is worth quoting the entire analysis:

> Petitioner alleges that the PCR court's decision was unreasonable because it ignored evidence in concluding that Dr. Briggs's report was not "significantly different" from the report considered at sentencing. The significant difference that Petitioner points to is Dr. Briggs's conclusion that Petitioner has neuropsychological deficits. Dr. Briggs stated in his report that Petitioner had a few impaired performances on his testing "which do not appear to have major clinical significance." (Pet. Ex. 22 at 2, 6.) While Dr. Briggs noted that Petitioner's functioning was recovered since the time of his head injuries and substance abuse, he concluded that Petitioner's neuropsychological function was normal and that there was no cognitive dysfunction. (*Id.* at 6, 3.) He also stated that Petitioner's psychological and emotional profile was the most significant factor in his behavior. (*Id.* at 6.) Similarly, Dr. Boyer concluded in 1991 that Petitioner's cognitive functioning was grossly intact, that he was of at least average intelligence, that he did not have any major mental disorder or psychiatric disturbance, but that his ability to relate emotionally was impaired and he had antisocial attitudes. (Pet. Ex. 58 at 3, 7, 9.) Dr. Briggs's report is in conformance with all of these findings. In light of the fact that Dr. Briggs indicated that Peti-

tioner's impaired performances were not of clinical significance and emphasized other issues as the major contributing forces in his behavior, the PCR court's conclusion that his report was not "significantly different" than Dr. Boyer's is not objectively unreasonable.

*Detrich v. Schriro*, No. CV-03-229-TUC-DCB, 2007 WL 4024551, at *22 (D. Ariz. Nov. 15, 2007).

Here, the state court's reference to the Briggs report is a question of reasonable interpretation and nuance, which does not meet § 2254(d)(2)'s strict standards. Such a formulation not only does not reasonably lead us to "merely doubt whether [the state court's fact-finding] process operated properly," *Taylor*, 366 F.3d at 1000, but it is also insufficient to support the majority's conclusion that the state court unreasonably determined the facts. The majority's efforts to reconstitute Dr. Briggs's findings do not change this conclusion. Extracting isolated morsels from Dr. Briggs's report, the majority leaves much of the context behind. Though Detrich's scored a 25 on the General Neuropsychological Deficit Scale, a score of 26-40 would only represent mild impairment. This score is in line with Dr. Briggs's observations that Detrich suffered from "mild neuropsychological deficits." Even acknowledging that his assessment represented a "recovered picture," Dr. Briggs concluded that "Detrich's brain is intact and he has good abilities when he accesses it." Dr. Briggs's comments regarding Detrich's emotional status as the "most significant factor" relate to Detrich's presentation at the time of evaluation and provide minimal insight regarding Detrich's mental state at the time of the crime. The report is hardly as direct and conclusive as the majority would like to believe.

Giving in to such post hoc interpretation and reconfiguration of the facts is not in accord with the AEDPA. The state court stated that it considered the Briggs report and we should accept that representation at face value. That the court did not

quote the entire seven-page report is hardly an AEDPA sin. In fact, Dr. Briggs made multiple findings, including those related to impulsivity, substance abuse, dysfunctional childhood, and severe abuse that support the court's conclusion that, at bottom, the report was "not significantly different" than the earlier reports. The added detail did not change the inevitable conclusion that the mitigation evidence was simply insufficient to overcome the aggravation factor in the view of the state habeas court. For example, the Briggs report acknowledged multiple deficiencies, such as: "His basic problem seems to be that he is impulsive and insists on having his own way regardless of the law or the feelings of other people"; "Residual effects from earlier peripheral hand [sic head] injuries are seen to contribute to some of the impaired performances"; and "[I]t is believe[d] that the mindset was developed in which instinct took over and reason could not be accessed." But it was not necessary for the court to reference or quote each of those findings to reach its conclusion nor should we impose such a burden. Would the majority reach the same conclusion had the state court simply attached or reproduced the language of the report in full? I trust that form should not trump substance. In sum, I conclude that the state court did not make an unreasonable determination of fact.

Whether the majority's conclusion as to an unreasonable factual finding is correct does not change the result. It simply triggers a de novo review that requires us to consider all of the psychological reports, including that of Dr. Briggs, along with the other evidence of mitigation. Reviewing the state record de novo, I agree with the state post-conviction court: in light of the especially heinous, cruel and depraved nature of the crime, coupled with the mitigation evidence—which was not overwhelming but ranged from childhood abuse, alcoholism, neurological deficit, remorse, and lack of a criminal record— there was no reasonable probability that the new evidence presented to the state post-conviction court "would have compelled [the trial court] to impose a sentence less than death."

## C.  ROLE OF NEW EVIDENCE

Post-trial, Detrich developed the record through Dr. Briggs plus additional, though essentially duplicative, evidence from his family. Now, in this habeas proceeding, he not only wants a "redo" and brush up on Dr. Briggs's testimony, he wants to bring in a host of other experts on a claim that he already presented to the state post-conviction court. In light of my analysis as to Detrich's inability to pass through the § 2254(d) bar, I would not proceed with new evidence.

But even with the benefit of the new evidence that the district court permitted before having the benefit of *Pinholster*, the district court concluded after extensive analysis that Detrich did not "prove[ ] that he suffers from a mental impairment which [was] a 'major contributing cause' to his conduct at the time of the crime," that he "ha[d] not discovered significant new or more weighty mitigation than was considered by the sentencing judge," and that "[e]ven if Petitioner is correct that no deference is owed under the AEDPA, the Court finds that Petitioner has failed to demonstrate prejudice under *Strickland*." I agree. Ultimately, Detrich does not present a new claim, previously undiscoverable evidence, suppressed evidence, evidence ignored by the state court, or a myriad of other circumstances that could qualitatively strengthen his assertions of prejudice. His piling on of new evidence does not alter either the weight or the conclusions drawn from the state court record.

I respectfully dissent.